**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| MARK ALLEN KALISCH, | Case No. 06-10706 (JMP) |
| Debtor. | |
| MARK ALLEN KALISCH, | |
| Plaintiff, | |
| v. - | Adv. Proc. No. 06-01717 (JMP) |
| MAPLE TRADE FINANCE CORPORATION, | |
| Defendant. | |
| In re | Chapter 13 |
| MAYRA DIAZ KALISCH, | Case No. 05-48660 (JMP) |
| Debtor. | |
| MAYRA DIAZ KALISCH, | |
| Plaintiff, | |
| v. - | Adv. Pro. No. 07-01484 (JMP) |
| MAPLE TRADE FINANCE CORPORATION and MARCO KALISCH, | |
| Defendants. | |

**MEMORANDUM DECISION GRANTING JUDGMENT AFTER TRIAL IN FAVOR OF MAPLE TRADE FINANCE CORPORATION**

FOLKENFLIK & McGERITY
Special Litigation Counsel for Mark Allen Kalisch
1500 Broadway, 21st Floor
New York, New York 10036

Max Folkenflik, Esq.

BACKENROTH FRANKEL & KRINSKY, LLP
Counsel for Maple Trade Finance Corporation
489 Fifth Avenue
New York, New York 10017

       Mark A. Frankel, Esq.

WANDER & ASSOCIATES, P.C.
Counsel for Mayra Diaz Kalisch
641 Lexington Avenue, 21st Floor
New York, New York 10022

       David Wander, Esq.

**JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

       The trial in these two related adversary proceedings took place over three days in July, and the Court provided some initial reactions to the evidence at the close of the hearing on July 31, 2008.  In light of these comments and with the hope of avoiding additional costs and delay associated with preparing post-trial submissions, the Court encouraged the parties to meet and confer regarding a possible settlement of claims and defenses.  Those efforts were unsuccessful.  Proposed findings, conclusions and briefs were submitted to chambers in November and have been sealed in accordance with a "so ordered" stipulation of counsel due to the potentially incriminating nature of some of the evidence.  Second Amended Post Trial Scheduling Order, Adv. No. 06-01717, (ECF Doc. # 22).  Counsel presented closing arguments on December 4, 2008.

       This decision resolves issues raised in these adversary proceedings, consolidated for trial, brought by Debtor Mark Allen Kalisch (also known and identified in this decision as "Marco") and his wife Debtor Mayra Diaz Kalisch ("Mayra" and, together with Marco, the "Kalisches") concerning the validity, priority and enforceability of a security interest granted by Marco to Maple Trade Finance Corporation ("Maple Trade")

in certain shares of stock in 2 East 12th St. Owners Corp. (the "Coop") and the three proprietary leases appurtenant to those shares evidencing ownership of three combined apartment units on the ground floor of a townhouse at 2 East 12th Street in Manhattan (collectively, the "Apartment").  The security interest was granted by Marco as guarantor to secure an asset-based commercial loan in the original amount of $1.5 million (the "Loan") from Maple Trade to Marco Kalisch Imports, Inc. ("MKI"), a corporation wholly owned by Marco that is engaged in the business of importing and reselling diamonds.  Maple Trade Trial Exhibit 1, Loan Agreement §§3, 11; Maple Trade Trial Exhibit 3, Loan Security Agreement at 2-3.

Marco is an ethically challenged businessman who admits to having performed and conspired with others to perform various allegedly wrongful acts in Brazil for personal gain and to having failed to honor his promise to Mayra to share ownership of the Apartment with her.  Trial Transcript (Under Seal), 14:8-15:23, 29:4-31:12, 44:5-21, July 24, 2008 A.M.[1]; Trial Tr. (Under Seal), 66:14-68:18, July 24, 2008 P.M.  Marco, regardless of his admitted failings, tells a riveting story of high risk opportunism in the Amazon jungle that must be mostly true; after all, it is hard to imagine that any rational witness under these circumstances would make up something so personally incriminating if it were not mostly the truth.[2]

---

[1] References to the trial transcript will be designated as Trial Tr.  Upon motion of Marco's counsel, Marco's testimony has been sealed.  This decision alludes to and references that testimony without mentioning specific details.   The Court has made every effort to decide a case that calls for a balancing of fault without disclosing any information directly subject to the sealing of Marco's testimony.  *See SEC v. TheStreet.com*, 273 F.3d 222, 232 (2d Cir. 2001) (citing *U.S. v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995), which annunciates the test for judicial determination of whether to modify a protective order).

[2] Maple Trade argues that sealing the record of Marco's testimony to preserve Marco's privilege against self-incrimination may be a reason to discount the value of that testimony because Marco is free to talk about criminality for purposes of evading his obligations to Maple Trade without exposing himself to the risk of prosecution.  The Court disagrees.  Marco's testimony regarding his exploits in Brazil is credible.

Marco's version of the facts becomes harder to accept as true, however, in relation to his dealings with Maple Trade. Marco has shown himself to be economically motivated to the point of doing what he knows to be indefensibly wrong, making him a witness of doubtful reliability in describing his version of conversations with employees of Maple Trade. Trial Tr. (Under Seal), 6:9-15, July 24, 2008 A.M. In evaluating his testimony, the Court has taken into account both Marco's character and the fact that he stands to benefit economically if he can show that Maple Trade knowingly financed his activities in Brazil.

Marco also is positioned to benefit regardless of whether he or Mayra prevails as plaintiff against Maple Trade. Given that Marco is an admitted scoundrel, it is not entirely clear whether these companion litigations have been orchestrated by the Kalisches and whether there is true adversity between them. Despite the possibility that the Kalisches are working together in their efforts to preserve the rental income generated by the Apartment,[3] it is not necessary to decide whether they are adverse to one another or aligned in order to resolve the issues presented.

As explained below, the Court finds that Maple Trade has been granted a valid, senior secured claim that is enforceable in accordance with its terms despite (i) Marco's contentions that Maple Trade should be barred from recovery under the doctrine of *in pari delicto* because it financed an unlawful scheme to acquire diamonds in Brazil, and (ii) Mayra's argument that she should be deemed an owner of the Apartment as of a date that predates the Loan in accordance with promises made to her by Marco, notwithstanding the lack of contemporaneous written evidence of joint title to the

---

[3] The Apartment was rented at the time of the pledge of the shares as collateral for the Loan from Maple Trade. It is still rented and produces a significant stream of rental income for the Debtors. Trial Tr., 75:13-76:22, July 31, 2008 A.M.

Apartment sufficient to satisfy the New York State Statute of Frauds.[4]  In Marco's case, the allegations of misconduct by Maple Trade were not proven, and in Mayra's case, no legal or equitable grounds exist to modify the title documentation for the Apartment to the detriment of Maple Trade.  Nonetheless, Mayra is entitled to judgment against Marco for his failure to fulfill his promise to grant her a valid and enforceable ownership interest in the Apartment.  She also has the right to assert a claim, based on that judgment, for damages caused by that breach of promise in Marco's bankruptcy case.

## *INTRODUCTION AND FACTUAL BACKGROUND*

### 1.  Marco's Adversary Proceeding

The story told by Marco could be the basis of a screenplay instead of a bankruptcy court decision.  The factual background, swirling with references to shady dealings and long journeys into remote areas of the Amazon jungle, describes an apparently illegal conspiracy to obtain rough diamonds from the Cinta Larga Indians in Brazil and import those diamonds into the United States for ultimate sale in the diamond market of Antwerp.  Trial Tr. (Under Seal), 6:9-15, July 24, 2008 A.M.

Marco was a central actor in these corrupt activities.  He asserts that he shared with Maple Trade a business plan describing his activities, and that Maple Trade, as lender to MKI, became a participant in the scheme by providing financing for the unlawful importation of diamonds that were sourced through an entity known as M3 organized in Brazil by Marco and two other business partners.[5]  Trial Tr. (Under Seal),

---

[4] *See* N.Y. GEN. OBLIG. LAW §5-703 (McKinney 2008).

[5] Marco's two business partners, coincidentally, were also named Marco.  M3 stood for the three Marcos (Marco Kalisch, Marco Glikas and Marco Suarez).  Notably, although Marco considered MKI and M3 as parts of the same integrated enterprise, MKI is a distinct legal entity with equity owned solely by Marco and with offices located on 47th Street in Manhattan.  M3 was a Brazilian corporation with three shareholders formed for the purpose of purchasing diamonds from the Indians (and dividing the profits

6:19-7:19, 37:11-41:25, July 24, 2008 P.M.; Trial Tr. (Under Seal), 29:4-18, July 24, 2008 A.M.  Marco in his testimony blurs the structural distinctions between MKI and M3 and conveniently treats both entities as if they were divisions of a single business enterprise.  Trial Tr. (Under Seal), 37:11-41:25, 83:6-20, 92:9-11, July 24, 2008 P.M.  Marco contends that Maple Trade should forfeit the right to recover amounts advanced to MKI as borrower because Maple Trade had information, both direct and indirect, revealing that the diamonds were being imported by MKI under highly suspect circumstances from unauthorized sources in Brazil.

The advances from Maple Trade to MKI were secured principally by Marco's grant of a security interest in shares of stock issued in his name that represented ownership in the Apartment.  Maple Trade Trial Exhibit 1, Loan Agreement §§3, 11; Maple Trade Trial Exhibit 3, Loan Security Agreement at 2-3.  The central question presented is whether Maple Trade will be permitted to recover the value of its collateral because of any knowledge that it had about the use of loan proceeds to finance unlawful aspects of Marco's business plan for sourcing diamonds from M3.  Maple Trade denies knowing anything specific about Marco's plan, and this is consistent with Marco's testimony.  Trial Tr., 90:21-24, July 23, 2008 P.M.; Trial Tr. (Under Seal), 78:11-81:16, 86:11-87:15, July 24, 2008 P.M.  Marco testified to being desperate for funding and was reluctant to say anything explicit to Maple Trade about bribing public officials in Brazil.  Trial Tr. (Under Seal), 78:11-81:16, 86:11-87:15, July 24, 2008 P.M.  He recognized that unambiguous statements regarding such illegal activities would almost certainly mean

---

three ways).  Wearing his M3 hat, Marco and his partners acquired the diamonds from the Indians in Brazil and then wearing his MKI hat acted as courier, hand-carrying the diamonds with him on flights to New York.

that the Loan would not be approved.  Trial Tr. (Under Seal), 112:12-15, July 24, 2008

P.M.  Marco's case relies on innuendo and implication rather than on plainly worded

disclosure.

Certain facts are briefly summarized in the Court's decision last year in *Kalisch v.*

*Maple Trade Fin. Corp.* ("*Kalisch I*"), and the Court assumes that the parties are familiar

with *Kalisch I* and the procedural history of these two adversary proceedings.  2007 WL

1580049, (Bankr. S.D.N.Y. May 30, 2007) (denying without prejudice Maple Trade's

motion to dismiss Marco's complaint on grounds of *in pari delicto*).  Since issuing the

decision in *Kalisch I*, a full record has been developed at trial, enabling the Court to

assess the credibility of witnesses, draw conclusions regarding the conduct and

knowledge of Marco and Maple Trade respectively, and to balance the relative fault, if

any, of the parties.  Based upon that record, as noted in greater detail in the sections that

follow, Marco has not shown that Maple Trade had actual or imputed knowledge of the

unsavory particulars of his business dealings in Brazil, thereby failing to establish that *in*

*pari delicto* should apply to the claims of Maple Trade or that Maple Trade should be

barred from recovery on public policy grounds.

Marco's case is based less on disclosure of a business plan predicated on

violations of the law of Brazil and more on presumptions and inferences as to what

Maple Trade should have surmised because of significant experience as a lender in Latin

America.  Marco, who has done business in Brazil for many years, testified that

corruption there is so widespread as to be considered more or less routine, and the

payment of bribes is alleged to be a common means to expedite commerce.[6]  Trial Tr.

---

[6] Maple Trade argues that there is no credible evidence of illegality under Brazilian law or the Foreign
Corrupt Practices Act and contends that statements made regarding the operations of M3 are self-serving

(Under Seal), 8:2-10:1, 25:19-26:11, July 24, 2008 A.M.; Trial Tr. (Under Seal), 80:10-12, 99:10-22, July 24, 2008 P.M.

The question of what Maple Trade knew when it approved the loan to MKI is also complicated by the role played by an individual named Victor Janovich ("Janovich"). Janovich did not appear as a witness, although he played a crucial role as an intermediary in inducing Maple Trade to make the Loan. According to testimony given by Marco and James Culver ("Culver"), a former Maple Trade managing director in charge of its asset based lending, Janovich functioned as a broker or a finder in the transaction. Trial Tr. (Under Seal), 31:22-32:22, July 24, 2008 P.M.; Trial Tr., 86:22-87:21, July 23, 2008 P.M. He was a personal friend and business associate of both Marco and Culver and the Loan almost certainly would never have been made were it not for Janovich's close ties to principals of both the lender and the borrower. The Kalisches were personal friends of Janovich and his wife and were frequent weekend guests in their home on Long Island. Trial Tr. (Under Seal), 22:23-23:15, July 24, 2008 A.M. Janovich also co-invested in real estate deals with Culver and was one of Culver's close business associates. Trial Tr., 34:24-35:13, July 23, 2008 A.M.; Trial Tr., 72:3-74:6, 79:4-84:23, July 23, 2008 P.M. What Janovich actually communicated to Culver in inducing him to recommend approval of the Loan is not known.[7]

---

and uncorroborated. Maple Trade Proposed Findings of Fact and Conclusions of Law at 1 n.1 (Nov. 3, 2008). The Court disagrees and believes that Marco has shown a violation of law governing diamond trading with the Indians. For purposes of this opinion, the Court concludes that Marco deliberately engaged in illegal activities, and that these activities utilized funds advanced by Maple Trade.

[7] Janovich's unusually cozy relationship with Culver and Kalisch makes it even more difficult to know whether Janovich openly shared or actively concealed information that he had about the nature of the operations in Brazil. Kalisch argues that Janovich must have told all that he knew about the deal to Culver because to conceal the truth would betray his friendship. It is equally plausible, however, that Janovich kept what he knew about the venture to himself, so as not to betray his friendship with Marco and/or to protect Culver.

Janovich principally lives in Nicaragua and allegedly is familiar with business practices throughout Latin America. Marco confided in Janovich and informed him regarding his plans to import diamonds purchased from the Cinta Larga Indians. Trial Tr. (Under Seal), 24:8-26:25, July 24, 2008 A.M. According to Marco, Janovich understood that the process described for obtaining the diamonds was unauthorized and involved the payment of bribes, and that this was considered a fairly standard way of doing business in that part of the world. *Id.* Marco has no direct knowledge of whether Janovich passed along this information to Maple Trade, but Culver claims to have been given no information indicating any improper use of Loan proceeds. Culver specifically stated that he was exclusively interested in the conduct of his borrower, MKI, and did not focus particular attention on the source of the diamonds. Trial Tr., 94:1-98:12, 103:17-104:19, July 23, 2008 P.M.

Janovich also had a personal economic stake in the transaction. Because of Marco's urgent need for cash to pay for diamonds that were ready for purchase, Janovich advanced his own funds to provide Marco with bridge financing for MKI that was to be repaid with the proceeds of the Maple Trade financing.[8] Trial Tr. (Under Seal), 24:22-26:17, July 24, 2008 P.M.; Trial Tr., 46:11-14, July 23, 2008 P.M. Janovich also was entitled to payment of a placement or finders fee from Maple Trade in connection with having produced the Loan. Trial Tr., 87:10-18, July 23, 2008 P.M. Janovich's bridge loan was repaid from proceeds of the Loan, and he received payment of his fee from

---

[8] Marco explained that diamonds are typically purchased in Brazil for cash and that local moneychangers serve as the intermediaries for these transactions. Moneychangers convert dollars into local currency and charge a fee for this service. Bills of sale and other documents of transfer are unreliable, fabricated or non-existent. A fictitious bill of sale was created for a diamond sale to support a funding request from Maple Trade. Trial Tr. (Under Seal), 9:3-20, July 24, 2008 A.M.; Trial Tr. (Under Seal), 120:1-25, July 24, 2008 P.M.

Maple Trade.  Trial Tr., 41:9-44:3, July 23, 2008 P.M.  Janovich is conspicuously in the middle of and financially interested in the transaction, but the Court has no direct information concerning what he said or did and has only limited guidance from the testimony as to the proper characterization of his role.  Notably, his absence and failure to appear and offer testimony for either party was never fully explained.[9]

Marco argues in his post-trial submissions that this missing witness functioned as an agent for Maple Trade and that whatever Janovich learned from Marco about the diamond trade in Brazil is knowledge that should be imputed to Maple Trade.  Marco and Maple Trade disagree on this point.  Maple Trade characterizes Janovich as an independent third-party who was simply being encouraged to identify and refer new lending opportunities.  According to Maple Trade, Janovich functioned as a nonexclusive promoter of deal flow, and the relationship was casual and purely transactional.

Upon consideration of the testimony of Marco and Culver, the Court finds that there is no persuasive evidence that Maple Trade knew any of the specifics of Marco's plans.  The testimony supports the opposite conclusion--that Marco concealed information to prevent explicit disclosure of the sordid details in order to assure approval of a loan that his business needed so badly.  Marco is a savvy businessman who understood that if he told Maple Trade directly that he intended to use Loan advances to violate the laws of Brazil, Maple Trade would not approve the transaction.  Marco presents nuanced and carefully hedged testimony--he talks about the common knowledge

---

[9] During closing argument, counsel for both parties confirmed that Janovich's deposition was not taken and that no effort was made by either side to contact him or request that he attend the trial.  Trial Tr., 61:6-25, Dec. 4, 2008.  Marco argues that the Court should draw the inference that Janovich's testimony would have been unfavorable to Maple Trade.  For reasons stated later in this opinion, the Court sees no reason to conclude that this witness would have given testimony unfavorable to Maple Trade because his appearance at trial or deposition might have been arranged with equal ease by either side in this dispute.

of people experienced in the ways of doing business in Brazil who are presumed to know that offering payments to public officials is an ordinary and customary part of doing business.[10]  Yet, at the same time, Marco acknowledges that if he had been completely candid in his disclosure to Maple Trade--if he had specified his intent to use the proceeds of the Loan to finance the possibly illegal acquisition of diamonds from the Cinta Larga Indians--such a disclosure effectively would have destroyed his chances to obtain approval of the Loan.  Trial Tr. (Under Seal), 112:12-15, July 24, 2008 P.M.

This internal tension within Marco's testimony ultimately weakens his credibility on the issue of whether he ever plainly disclosed his business plans to officers of Maple Trade before the Loan was approved.  The Court is convinced that he did not make disclosures sufficient to put Maple Trade on actual or inquiry notice of the corrupt practices underlying his sketchy business plan.  At most, Marco may have used words he considered to be code words, generally understood by the cognoscenti, to convey a concept that he never made explicit.  Marco could not have told Maple Trade his plans in plain language because he had a pressing need for the funds and was aware that the hint of illegality carried with it the unacceptable risk of rejection of his loan application.  The only sound conclusion supported by the evidence is that Marco finessed the subject, made incomplete, vague and evasive disclosures and kept the truth to himself.  Perhaps Marco was open and candid with his good friend, Janovich, and he may have related some of the

---

[10] One such person is Pablo Mariño, an employee of Maple Trade who also did not testify.  Marco testified that Mr. Mariño had a deep understanding of Latin American business practices and understood that bribery was commonplace.  Marco also stated that he advised Mr. Mariño of his specific plans to obtain diamonds from the Cinta Larga Indians.  Given the internal stress within Marco's testimony on the subject of disclosure, the Court is disregarding Marco's statements about what he allegedly told Mr. Mariño as being inconsistent with earlier deposition testimony and not credible.  Furthermore, Mr. Mariño apparently lives in Manhattan.  Marco or Maple Trade could have subpoenaed him to testify to corroborate or rebut their version of the facts.  Neither did, and because Mr. Mariño was equally available to all parties in this dispute and could have, if called, testified to support either version of the facts, the Court will not draw any adverse inference from Mr. Mariño's failure to testify.

sordid details with the expectation of confidentiality, but it is evident that he was not candid in his discussions with Maple Trade itself and that the doctrine of *in pari delicto* is not applicable to Maple Trade's claims in Marco's bankruptcy case.

## 2. Mayra's Adversary Proceeding

While resting on entirely different facts and legal theories, the separate actions brought by Marco and Mayra complement one another and together seek to prevent Maple Trade from realizing on its collateral. Mayra claims in her separate complaint that her husband promised to make her a joint owner of the Apartment, that at all times husband and wife acted in a manner consistent with joint ownership,[11] and that she believed that she was an owner as a result of signing loan documents from Emigrant Savings Bank ("Emigrant") that listed her as an owner of the Apartment and a borrower.

When Mayra met Marco in 1993, he owned and was living in a studio apartment at 2 East 12th Street in New York, which was originally known as ground rear or GR. Trial Tr., 56:23-57:18, July 31, 2008 A.M. Marco and Mayra decided to move in together in 1996 and Marco purchased the second apartment, an adjoining unit known as ground studio or GS, which was combined with the first studio. *Id.* at 57:23-58:13. Marco and Mayra were married, and in 1998 had a child. The Kalisches then decided to purchase another adjacent unit, known as ground front or GF. *Id.* at 59:1-59:14. Mayra claims that she contacted the owners of the GF apartment, the Solomines, and eventually convinced them to sell to the Kalisches. When the Kalisches purchased GF, Marco already had a mortgage on GR and GS, which was to be refinanced in connection with the closing on GF. Mayra agreed to become a co-borrower under the refinanced loan

---

[11] As of the date of the pledge of the Apartment as collateral for the Loan, Marco alone was listed as owner of the shares and as tenant in the proprietary lease for the Apartment. Mayra Kalisch Trial Exhibits 1-4, Stock Certificates, UCC-1, UCC-3.

from Emigrant and believed that title to the Apartment was to be transferred from Marco alone to Marco and Mayra as joint tenants at that closing. *Id.* at 59:8-63:8.

During the July 6, 1999 closing on GF, two sets of sale and financing documents allegedly were prepared: the first listed only Marco as owner of the Apartment, and the second listed both Marco and Mayra as owners. Trial Tr., 129:1-15, July 23, 2008 P.M. Mayra is named as an assignee of the Solomines' proprietary lease for GF, and the Emigrant refinancing loan documents identified both Marco and Mayra as borrowers. Mayra Kalisch Trial Exhibit 11, Solomine Assignment of Lease; Mayra Kalisch Trial Exhibit 6, Emigrant Mortgage. It appears that Mayra, as Attorney in Fact for Marco, signed acquisition and financing documents listing Marco as the sole owner of the Apartment. Notably, the certificates evidencing ownership of shares in the Coop were issued only in Marco's name. Mayra Kalisch Trial Exhibits 1-2, Coop Stock Certificates; Maple Trade Trial Exhibit 14, State Court Record on Appeal at 136-38.

In February 2004, Marco, as sole owner, pledged the Apartment to Maple Trade as security in connection with the Loan.[12] Trial Tr. (Under Seal), 67:17-68:11, July 24, 2008 P.M; Maple Trade Trial Exhibit 3, Loan Security Agreement at 2-3. On January 26, 2005, Maple Trade served a notice of default. Maple Trade Trial Exhibit 5, Notice of Default. Two weeks later, the Kalisches reissued the Coop stock certificates listing both Mayra and Marco as owners. Maple Trade Trial Exhibit 14, State Court Record on Appeal at 41-99. Maple Trade then noticed a public auction of the Apartment for May 5, 2005. Maple Trade Trial Exhibit 6, Notice of Auction. In an effort to block the sale, Mayra sought a preliminary injunction in New York State Court. On June 9, 2005, the

---

[12] This is not the first time that Marco had acted on his own to pledge the Apartment. Part of the Loan went to pay off the primary security interest held by Merrill Lynch. Trial Tr., 47:10-48:20, July 23, 2008 P.M.

New York Supreme Court issued a decision that denied Mayra's request for a preliminary injunction, because she failed to establish an ownership interest in the Apartment and could not demonstrate a likelihood of success on the merits of her claim. *Kalisch v. Maple Trade*, No. 106159/05 (N.Y. Sup. Ct. June 9, 2005). Mayra appealed the state court decision immediately. Maple Trade Trial Exhibit 14, State Court Record on Appeal at 4 (Notice of Appeal). The appeal was argued before the Appellate Division on October 6, 2005.

On October 16, 2005, Mayra filed for bankruptcy protection, staying the State Court appeal process and preventing a ruling from the Appellate Division. Thereafter, this Court entered an order on December 12, 2005, granting Maple Trade's motion for stay relief allowing the Appellate Division to proceed with the pending appeal. Two weeks later, on December 29, 2005, the Appellate Division affirmed the Supreme Court decision. *Kalisch v. Maple Trade,* 24 A.D.3d 308 (N.Y. App. Div. 2005). Subsequently, Maple Trade noticed a new public auction of the Apartment to be held on April 6, 2006. Maple Trade Trial Exhibit 7, Notice of Auction. Marco filed for bankruptcy protection the day before the proposed sale, on April 5, 2006.

Mayra's complaint asserts that her ownership should be recognized and ratified under a variety of legal theories, including promissory estoppel. She invokes the equitable powers of the Court to deem her an owner of the Apartment even though contemporaneous documentation listed Marco as the sole owner when he pledged the shares as collateral for the Loan. Mayra also raises a number of sympathetic arguments relating to the harm she is likely to suffer, including her daughter's special needs and the materially adverse financial consequences to her and her daughter if Maple Trade is

permitted to foreclose on the Apartment.

These arguments largely miss the point.  Marco undoubtedly promised, at or around the time of his marriage to Mayra, to grant her an interest in the Apartment and may have sincerely intended that new share certificates reflecting such joint ownership be issued in the names of husband and wife as tenants by the entireties, but that did not happen prior to the underwriting of the Loan.  The necessary paperwork reflecting the promise made to Mayra was not put in place in a timely manner.  Mayra enjoyed the use of the Apartment while living there and currently receives, with her husband, the benefit of monthly rental income, but she was not an owner of record when Marco pledged the shares to Maple Trade and that is fatal to her claims.

Importantly, Marco knew what he was doing.  He was fully conscious of the fact that the Apartment was his and his alone to pledge when he negotiated the terms of the Loan with Maple Trade and understood that unless he pledged his shares, there would have been no Loan.  In pledging the shares issued in his name, Marco was able to borrow the funds he needed without having to ask Mayra for her consent.  Marco was well aware of the situation and exploited it.

The Apartment is part of a small cooperative with only a few units and seems to have been managed informally.  Trial Tr., 35:22-37:12, 39:4-40:1, 43:7-45:24, July 31, 2008 A.M.  The two witnesses who testified regarding governance of the cooperative corporation confirmed that they believed Mayra was an owner of the Apartment with her husband, but their understanding is not relevant to the issue of whether Mayra was an owner as a matter of law.  Trial Tr., 40:2-41:1, 46:13-47:8, July 31, 2008 A.M.

Mayra also called as one of her witnesses a lawyer who represented the

cooperative corporation and the Kalisches in closing of the refinancing loan from

Emigrant.  These loan documents demonstrate the reasonable confusion that Mayra and

others had concerning her status as co-owner, but alone do nothing to resolve the

question of her rightful status.  Plainly, the only documents that truly matter to determine

ownership are the share certificate(s) and the proprietary lease.  These documents

confirm that Mayra was not an owner when Marco pledged the Apartment as collateral.

Mayra Trial Exhibits 1-4, Coop Stock Certificates, UCC-1, UCC-3.

Notwithstanding the documentation, Mayra contends that, as an innocent spouse,

she has an equitable claim to ownership of the Apartment that should defeat the security

interest granted by Marco to Maple Trade.  Even though the documentation does not

correspond with Marco's stated intentions and her expectations, she urges the Court to

use its equitable power to declare her an owner.  As discussed below, the Court declines

to do so.

## DISCUSSION

### 1.  *In Pari Delicto* Doctrine

Marco principally relies on the doctrine of *in pari delicto* in an attempt to retain

ownership of the Apartment and escape liability for the Loan.  The doctrine derives from

the Latin, *in pari delicto potior est conditio defendentis*: "'In a case of equal or mutual

fault . . . the position of the [defending] party . . . is the better one.'"  *Bateman Eichler,*

*Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (alterations in original) (quoting

BLACK'S LAW DICTIONARY 711 (5th ed. 1979)).

"The doctrine is based on two premises:  'courts should not mediate disputes

between wrongdoers, and denying judicial relief to a wrongdoer deters illegal conduct.'"

16

*Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 308 (S.D.N.Y. 1998) (quoting *In re Granite Partners, L.P.,* 194 B.R. 318, 328 (Bankr. S.D.N.Y. 1996)). The doctrine is "rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). "The doctrine of *in pari delicto* provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 354 (3d Cir. 2001). A plaintiff is prohibited from bringing a claim where the plaintiff was "'an active, voluntary participant in the unlawful activity that is the subject of the suit.'" *Granite Partners, L.P.*, 17 F. Supp. 2d at 308 (quoting *Pinter, 486 U.S. at 632)*. Here, the self-proclaimed, admitted wrongdoer is Marco, while Maple Trade is the commercial lender that denies participation in any wrongdoing or even knowing that Marco was doing anything illegal.

As first noted in *Kalisch I*, the relief requested effectively turns the caption upside down--Marco, as plaintiff, is seeking to bar Maple Trade, as defendant, from recovering on its secured claim. Fundamentally, the suit is defensive in nature, reversing the meaning of the labels "plaintiff" and "defendant" for purposes of the *in pari delicto* analysis. The doctrine is typically invoked as an affirmative defense to an action based on a violation of a statute or common law where the plaintiff in the action was, or is deemed to have been, a participant in the acts giving rise to that violation. In such cases, the state or federal statutes and case law applicable to the underlying dispute dictate the test for successful invocation of *in pari delicto* as a defense. *See In re Adelphia Commc'n Corp.,* 365 B.R. 24, 62-63 (Bankr. S.D.N.Y. 2007).

The Court has found no other case using *in pari delicto* affirmatively to achieve a

financial benefit, certainly not in a bankruptcy setting.  Regardless of the formulation of

the rule that may apply here, there is one constant--the party to be barred from recovery

must be shown to have committed some level of wrongdoing.  *Compare Official Comm.*

*of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145 (11th Cir. 2006) (relying

on federal common law) *with Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114

(2d Cir. 1991) (relying on New York and Connecticut law).

**2.  Application of *In Pari Delicto* to Marco's claims**

Maple Trade is the party whose conduct is alleged to bar recovery on its secured

claim, yet the evidence presented fails to demonstrate that Maple Trade violated any laws

in the United States or in Brazil.  Marco has given unrebutted testimony describing in

detail business practices that lead to the arrest of his business partners by the Brazilian

authorities.  Trial Tr. (Under Seal), 38:6-43:7, 46:4-50:6, July 24, 2008 P.M.  He also has

described concerns for his own safety prior to fleeing the country.  *Id*.  He devised and

implemented a business plan for activities that were unlawful.  Maple Trade's only overt

act was to consummate and perform under loan documents which, on their face, do

nothing more than provide funding for MKI.

Ultimately, Marco asks the Court to determine how much knowledge of a

borrower's improper conduct is sufficient to label a lender a wrongdoer for purposes of

invoking the *in pari delicto* doctrine.  At trial, Marco failed to prove that Maple Trade

had any actual or imputed knowledge of the illegal nature of his Brazilian business.  As a

result, *in pari delicto* does not apply here to bar recovery by Maple Trade.

### a.  Actual Knowledge of Illegal Activity in Brazil

Maple Trade claims to have had no knowledge about illegal operations in Brazil. The knowledge of a corporate entity is a function of what its employees and agents learn in the performance of their duties.  *See Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 363 (2d Cir. 1959).  Culver knew generally about business practices in Brazil, but denied knowing anything about the specifics of M3's business.  Trial Tr., 33:1-7, July 23, 2008 A.M.  In fact, no witness for Maple Trade admits to having actual knowledge of Marco's conduct in Brazil.  *Id.;* Trial Tr., 12:6-8, July 24, 2008 A.M.  The testimony on behalf of Maple Trade is corroborated by Marco who testified that he deliberately withheld specifics from Maple Trade because of the risk that full disclosure of the facts would lead to rejection of his loan application.  Trial Tr. (Under Seal), 112:12-15, July 24, 2008 P.M.

### b.  Violations of The Foreign Corrupt Practices Act

As an alternative theory, Marco refers to the Foreign Corrupt Practices Act (the "FCPA")[13] but has not proven any violation of that law.  In relevant part, the FCPA states:

> It shall be unlawful for any domestic concern, . . . or for any officer, director, employee, or agent of such domestic concern[,] . . . to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, [or] promise to pay . . . anything of value to--
>
>  . . .
>
> (3) any person, **while knowing that all or a portion of such money . . . will be offered, given, or promised, directly or indirectly, to any foreign official . . . for purposes of--**

---

[13] 15 U.S.C.A. § 78dd-1 through 3 (1998).

> **(A)(i) influencing any act or decision of such foreign official . . . in his
> . . . official capacity . . . .**

15 U.S.C.A. § 78dd-2(a) (1998) (*emphasis added*).  Insofar as the FCPA requires

knowledge of the alleged corruption, Marco's problems of proof are the same for

the alleged FCPA violations as they are for his *in pari delicto* argument.  Marco

has not offered convincing evidence that Maple Trade had actual knowledge that

Loan proceeds advanced to MKI would be offered or given to any public official

for purposes of influencing any decisions made in Brazil.  *See* Trial Tr. (Under

Seal), 73:4-75:25, 78:9-79:5, July 24, 2008 P.M.  Marco has not shown that

Maple Trade had actual knowledge of laws being broken in Brazil or the United

States.

### c.  Imputed knowledge

Marco argues that the Court may impute knowledge of his activities to Maple

Trade in two ways.  The first requires a showing that Maple Trade had reason to inquire

further as to the source of the diamonds.  If that inquiry would have uncovered the facts

of Marco's wrongful activity, Maple Trade will be charged with knowledge of that

activity.  The second would impute such knowledge to Maple Trade under agency

principles.  Generally, if an agent of Maple Trade knew about illegality Maple Trade is

deemed to have that knowledge.

### (i)  Inquiry Notice

In the Second Circuit, the test for determining whether a party is placed on

inquiry notice is objective.  *See In re Bayou Group, LLC,* 396 B.R. 810, 848 (Bankr.

S.D.N.Y. 2008); *In re Integrated Res. Real Estate Ltd. P'ships Secs. Litig.*, 815 F. Supp.

620, 637 (S.D.N.Y. 1993).  Whether a party is deemed to be on inquiry notice depends on

whether the facts known by that party would induce a reasonable actor in a similar position to investigate the matter further. *See Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 89 F. App'x. 287 (2d Cir. 2004) (discussing inquiry notice in the context of a securities fraud case); *Kahn v. Kohlberg Kravis, Roberts & Co.*, 970 F.2d 1030 (2d Cir. 1992) (addressing inquiry notice for purpose of tolling the statute of limitations in a contract rescission case); *Fischer v. Reich*, 1995 WL 23966 (S.D.N.Y. 1995) (discussing inquiry notice standard in a RICO case). Parties on inquiry notice who do not make diligent inquiry are charged with knowledge of the facts they would have learned upon making such inquiry. *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983) ("'[I]f he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.'") (quoting *Higgins v. Crouse*, 42 N.E. 6, 7 (N.Y. 1895)).

Marco points to the "red flags" that he asserts should have put Maple Trade on inquiry notice and trigger a duty to inquire further. Deeper investigation, absent active concealment by Marco, presumably would have lead to discovery by Maple Trade of Marco's Brazilian scheme. As examples of these "red flags," Marco's counsel highlights the business plan given to Culver during Maple Trade's due diligence, which discloses the existence of a government partner in Marco's Brazilian company who "shall remain silent," and the need to "officialize" the business before hiring a secure means of importation (such as Brinks). Trial Tr. (Under Seal), 14:21-15:6, 17:9-17, July 24, 2008 P.M; Mayra Kalisch Trial Exhibit 19, Business Plan at 1.

These "red flags" might well have prompted further inquiry, but the failure to inquire may be explained by the lender's compartmentalized approach to risk assessment.

The Loan was to MKI.  Diamonds became collateral for the Loan only after they reached

the United States and/or became inventory of MKI.  Maple Trade claims to have relied on

the representations and warranties made in the Loan documents regarding the legal

importation of these diamonds.  Maple Trade's loan documents expressly required Marco

to conduct the business of MKI in compliance with all "valid regulations, laws and orders

of any governmental authority," and to represent that the transactions contemplated by

the loan documents with Maple Trade do not violate any provision of law or statute.

Maple Trade Trial Exhibit 1, Loan Agreement §§ 16(d), 17(a); Maple Trade Trial Exhibit

2, Guaranty § 10.  Any failure by Marco to conduct his business lawfully would

constitute a default under the Loan.  Maple Trade Trial Exhibit 1, Loan Agreement

§§19(b) and (c).  As conditions precedent to funding any portion of the Loan, Maple

Trade required, among other things, that Marco certify the estimated cost of any

upcoming purchases of diamonds and produce Kimberley Certificates[14] for each parcel of

diamonds received.  Maple Trade Trial Exhibit 1, Loan Agreement §§ 8, 15(g).  If MKI

or Marco defaulted on the Loan, Maple Trade had ample collateral (in the Apartment) to

look to for repayment.

     Culver appears to have disregarded the "red flags"[15] because they related to

matters of no significance to the Loan, inasmuch as the Loan was otherwise secured.

---

[14] The Kimberley Process Certification System ("Kimberley Process") is a process introduced by United Nations Resolution 55/56 and fully implemented in August of 2003.  The Kimberly Process requires participating governments to ensure that each shipment of rough diamonds be exported/imported in a secure container, accompanied by a uniquely numbered, government-validated certificate stating that the diamonds are from sources free of conflict ("Kimberley Certificate").  *See* G.A. Res. 55/56, U.N. Doc. A/RES/55/56 (Jan. 29, 2001); G.A. Res. 57/302, U.N. Doc. A/RES/57/302 (Apr. 30, 2003); G.A. Res. 57/489, Annex 2, U.N. Doc. A/RES/57/489/Annex2 (Feb. 21, 2003).

[15] Marco argues that Culver did more than disregard the "red flags" and contends that Culver deliberately turned a blind eye to the indicators of criminality.  There is no proof in the record on this point, and the Court concludes that Culver paid little attention to the Brazilian operations because those details did not directly concern his borrower.

Because Marco, by his own admission, consciously kept the specifics of the operations in Brazil to himself and knew that disclosure of all the facts carried with it a risk that his loan application would be denied, the Court concludes that the existence of "red flags" potentially consistent with Culver's imputed knowledge, if any, is offset by the concealment of damaging facts by a borrower desperate for funding.  Culver either did not see the "red flags" as relevant or was encouraged by Marco to view the business opportunity as legitimate.  Either way, Culver was not on notice regarding corrupt aspects of the operations in Brazil.

Marco cites to *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. [Found. Of the S'holders' Comm. Representing the Former S'holders of Saybolt Int'l B.V.] v. Schreiber,* 145 F. Supp. 2d 356 (S.D.N.Y. 2001) *rev'd,* 327 F.3d 173 (2d Cir. 2003) ("*Stichting*"), for the proposition that Maple Trade cannot hide behind corporate distinctions and compartmentalized thinking to shield it from liability.  Marco Kalisch Post Trial Reply Memorandum of Law at 11 (November 24, 2008).  In *Stichting* the district court granted summary judgment to dismiss a malpractice complaint by the assignee of a Dutch company against a former director of its U.S. subsidiaries.  The director, who was a lawyer, advised the board of the U.S. subsidiaries that a bribe to a Panamanian official would not violate the FCPA if the bribe money were paid through non-U.S. affiliates.  The plaintiff's C.E.O. was convicted of FCPA violations after trial and the Dutch parent plead guilty.  The Court alluded to the fact that payment of a bribe would violate the FCPA even if channeled through non-U.S. affiliates, so long as the bribe was arranged by corporate officers in the United States.  *See Stichting*, 145 F. Supp. 2d at 358.

*Stichting* is more helpful precedent for Maple Trade than for Marco.  On appeal, the Second Circuit makes clear that knowledge of corruption is paramount in finding liability under the FCPA.  *See Stichting*, 327 F.3d at 177, 179-80.  If there were proof that Maple Trade actually knew that its borrower was an integral part of a scheme to import diamonds wrongfully acquired from the Indians (especially one that included paying bribes to foreign officials), or if it were possible to treat the separate entities as a consolidated business, the fact that MKI and M3 were separate legal entities would not insulate Maple Trade from claims of involvement in the scheme.

The Court finds that the evidence presented by Marco is insufficient to prove that Maple Trade actually knew that its borrower was involved in anything illegal or deliberately chose not to inquire to maintain a pose of plausible deniability.  Furthermore, there has been no evidence presented that would require the Court to disregard the corporate structure of Marco's business.  Marco delivered a business plan that included a schematic diagram showing the path that the diamonds took from Brazil to Antwerp, but that plan was too vague and lacking in specifics to put Maple Trade on notice that the diamonds were being acquired illegally.  Culver's testimony is consistent with an asset-based lender's characteristic focus on the value of collateral rather than the soundness of a business plan.  Accordingly, the Court believes Maple Trade had no duty to inquire any further into MKI's business than it did.

**(ii)  Agency and the Adverse Interest Exception**

Janovich, to the extent that he may be deemed an agent of Maple Trade, could provide another basis for imputing knowledge to Maple Trade.  Janovich's role as both a close confidant of Marco and a facilitator of the transaction with ties to Maple Trade

raises questions about what Janovich knew (as opposed to what Marco has said that he

told him or assumed that he knew) about Marco's business dealings in Brazil. The record

does not support a finding that Janovich was Maple Trade's agent. "Agency is a legal

concept that depends on the existence of three elements: (1) 'the manifestation by the

principal that the agent shall act for him'; (2) 'the agent's acceptance of the undertaking';

*and* (3) 'the understanding of the parties that the principal is to be in control of the

undertaking.'" *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) (emphasis

in original) (quoting *Cabrera v. Jakabovitz,* 24 F.3d 372, 385 (2d Cir. 1994)). The first

two elements of agency are not satisfied by the informal agreement that existed between

Maple Trade and Janovich, whereby Maple Trade agreed to pay Janovich a fee or a

profits percentage on any loan Janovich referred to Maple Trade. There is no evidence

whatsoever that Maple Trade delegated any power to Janovich. Instead, Janovich

functioned as a deal "finder" and has been described as an independent source of leads

for new loans. Trial Tr. (Under Seal), 35:17-36:15, July 23, 2008 A.M.

Moreover, Marco failed to prove the third element of agency—the understanding

of the parties that Maple Trade was "in control of the undertaking." "The right of control

by the principal may be exercised by prescribing what the agent shall or shall not do

before the agent acts, or at the time when he acts, or at both times." RESTATEMENT

(SECOND) OF AGENCY § 14 cmt. a (2008). *See Dixon v. United States,* 465 U.S. 482, 509

(1984). Marco listed several factors to support his contention that Maple Trade

controlled Janovich: Maple Trade funded Janovich's business, Culver loaned large sums

of money to Janovich, and Maple Trade has not attempted to collect on Janovich's

personal guaranty of the Loan.

While these factors indicate that Maple Trade did have some economic leverage over Janovich, none of them relate to the loan underwriting or approval process nor do they, individually or in combination, amount to control over Janovich as Maple Trade's purported agent. The factors show a mutually beneficial business relationship but do not prove agency. Janovich functioned as an independent, economically motivated "friend" of the deal.

Even if an agency relationship existed, and Janovich knew that Marco was borrowing money from Maple Trade to finance an illegal venture in Brazil, such knowledge would not be imputed to Maple Trade by virtue of the adverse interest exception. In situations involving fraud, courts impute the fraud of an officer to a corporation when the officer commits the fraud (a) in the course of his employment, and (b) for the benefit of the corporation, but fraudulent conduct will not be imputed if the officer's interests were adverse to the corporation and not for the benefit of the corporation. *See In re CBI Holding Company, Inc.,* 529 F.3d 432, 448 (2d Cir. 2008); *In re Food Mgmt. Group LLC*, 380 B.R. 677, 696 (Bankr. S.D.N.Y. 2008).

Although Janovich's motives in the transaction remain obscure, it is clear that he benefited economically when the Loan closed. Not only did he receive a fee at closing, but the proceeds of the Loan were used in part to pay off his bridge loan to Marco. This demonstrates the existence of a material economic interest that is adverse to Maple Trade and suggests that Janovich was acting in his own best interest, not for the benefit of Maple Trade. As a result, the adverse interest exception should preclude any imputation of Janovich's knowledge to Maple Trade, regardless of his status as an agent.

### d.  The Missing Witness Rule

Janovich never appeared to offer his own version of the facts, and the nature and extent of his knowledge is unknown.  Marco argues that this Court should draw an unfavorable inference against Maple Trade because of Janovich's absence as a witness. When "a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable."  *Graves v. United States*, 150 U.S. 118, 121 (1893).  Drawing an adverse inference against a party under the so called "missing witness rule" requires that only one party has the ability to produce the witness. A witness is unavailable to one party in a litigation where "'the witness is physically available only to the opponent or . . . the witness has the type of relationship with the opposing party that practically renders his testimony unavailable to the moving party.'" *See Ranish v. Delta Airlines, Inc.*, 89 F.3d 826 (2d Cir. 1995) (quoting *Oxman v. WLS-TV*, 12 F.3d 652, 661 (7th Cir. 1993);

Maple Trade represented that it was unaware of Janovich's whereabouts during the trial, neither side made any attempt to depose him and neither party made any effort to bring him to Court to testify.  Trial Tr., 61:1-23, Dec. 4, 2008.  The missing witness rule does not apply to Janovich by reason of his physical location because Marco did not prove he was physically available only to Maple Trade.  *See United States v. Caccia,* 122 F.3d 136, 138 (2nd Cir.1997).  Where physical availability is not an issue, a court may find that a relationship between a party and a witness renders that witness "unavailable." This is true where the court draws a reasonable inference that the witness would naturally give testimony that favors one party because of that relationship.  *See, e.g., United States*

*v. Christ,* 513 F.3d 762, 773 (7th Cir. 2008) (finding unavailability based on the relationship of employment by party); *Satnick v. Nat'l R.R. Passenger Corp.,* 2005 WL 236493 at *2 (S.D.N.Y. 2005) (finding unavailability because the missing witness was an expert witness listed to be called by the opposing party).

Marco's assertion that Maple Trade had a relationship with Janovich that would naturally induce Janovich to testify against Maple Trade's interests is groundless. It is undisputed that Janovich had a close relationship with both parties, an economic stake in the Loan, and conceivably even a stake in the success of Marco's Brazilian venture, but there is no evidence that reveals a natural tendency for Janovich to favor one side over the other. *See* Trial Tr. (Under Seal), 22:23-23:15, July 24, 2008 A.M.; Trial Tr., 34:24-35:13, July 23, 2008 A.M.; Trial Tr., 72:3-74:6, 79:4-84:23, 11:2-6, July 23, 2008 P.M.

Janovich's close connections with both Marco and Culver makes him a witness who seems to have been equally available to both parties and who might have been willing to testify during the trial at the request of either Marco or Maple Trade. Given that both men had independent business dealings and a cooperative relationship with Janovich, the fact that he was not called as a witness by either party raises no inference that if he had been called as a witness his testimony would have favored one side in this dispute.

In situations where a missing witness is as likely to testify in favor of one party as the other, the trial judge may make an adverse inference, if at all, against both parties. *See Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270, 275 (2d Cir.1996). *See also U.S. v. Caccia*, 122 F.3d at 139. The Court would have been better informed about the transaction, and Janovich's role as a middle man, if he had testified during the trial (or if

his deposition testimony had been taken and made part of the record), but the parties

chose to present their cases with only indirect and oblique references to Janovich.  Under

these circumstances, the Court has decided not to draw any adverse inference as to either

party because of Janovich's failure to appear.

### e.  Comparative Fault and *In Pari Delcito*

In comparing the relative fault of Marco and Maple Trade, Marco is an active

wrongdoer while Maple Trade simply is a passive lender that financed his bad acts.

Maple Trade's major failing is in having approved a loan after performing an inadequate

investigation of its borrower.  In relative terms, his culpability is so obvious and his

conduct so inexcusable that he should not be able to resort to *in pari delicto* as a means to

benefit himself.  For the doctrine to be applicable, "[i]t is not enough that both parties are

at fault, or *in delicto*—they must be **equally** at fault, or *in **pari** delicto*."  *In re Grumman*

*Olson Indus., Inc.*, 329 B.R. 411, 424 n.5 (Bankr. S.D.N.Y. 2005) (emphasis added).  *See*

*In re Kalisch*, 2007 WL 1580049, at *4 (Bankr. S.D.N.Y. 2007) (recognizing the

exception to *in pari delicto* and allowing the Court to grant or deny relief when the

parties' participation is not equal and one party's conduct is more outrageous on public

policy grounds).  As a brazen wrongdoer, Marco's fault is disproportionately greater than

that of his lender.  Any contributing fault on the part of Maple Trade, in contrast, does not

involve active misconduct at all.  At most, Maple Trade was insufficiently diligent and

failed to detect and uncover a plot that Marco did not want to disclose.  This is an

additional reason to deny relief to Marco under his *in pari delicto* argument.

### 3.  Equitable Subordination and Recharacterization

Marco's claims for equitable subordination or recharacterization are without merit

and are otherwise lacking in support.  Equitable subordination is an extraordinary remedy

that is to be used sparingly.  *See In re Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir.

1991).  In all cases concerning equitable subordination actual harm to creditors is a

necessary component to application of the doctrine.  *See Wooley v. Faulkner (In re SI

Restructuring Inc.)*, 532 F.3d 355, 361 (5th Cir.2008).  In cases of non-insider equitable

subordination such as this, the proponent of subordination has the burden of proving,

among other things, that the claimant engaged in egregious, improper or wrongful

conduct that damages creditors.  *See In re Delphi Corp.*, 2008 WL 3486615, at *22

(Bankr. S.D.N.Y. 2008); COLLIER ON BANKRUPTCY-15TH EDITION REV. P 510.05[4].

Marco has not established any of the elements of equitable subordination of Maple

Trade's claim under applicable law.

Similarly, recharacterization is also unavailable as a remedy.  Courts look at no

less than eleven factors, in various combinations, to determine whether it is appropriate to

recharacterize a claim.  These include:

> (1) the names given to the instruments, if any, evidencing the
> indebtedness; (2) the presence or absence of a fixed maturity date and
> schedule of payments; (3) the presence or absence of a fixed rate of
> interest and interest payments; (4) the source of repayments; (5) the
> adequacy or inadequacy of capitalization; (6) the identity of interest
> between the creditor and the stockholder; (7) the security, if any, for the
> advances; (8) the corporation's ability to obtain financing from outside
> lending institutions; (9) the extent to which the advances were
> subordinated to the claims of outside creditors; (10) the extent to which
> the advances were used to acquire capital assets; and (11) the presence or
> absence of a sinking fund to provide repayments."

*In re Adelphia Commc'ns Corp.,* 365 B.R. at 74.

Recharacterization focuses on the substance of the transaction, not merely the

form.  Recharacterization has not been vigorously pressed as a theory in this case, and no

evidence was presented to support such a theory. It is clear that the Loan has all the relevant hallmarks of true debt and that the parties to the transaction viewed it as a loan that was expected to be repaid. The only hint of equity in the transaction is an "equity kicker" feature. This yield enhancement measure does not alter the essential character of the Loan. The equity component was an inducement to the make the Loan, and was never a substitute for repayment.

Applying the factors noted above from the *Adelphia* case demonstrates that Maple Trade is a creditor, MKI is a borrower, and the resulting claim to recover advances easily fits the definition of debt. After considering the character of the transaction, the Court finds no basis in fact or law to recharacterize Maple Trade's secured claim. Sums were advanced to MKI from an unaffiliated commercial lender as corporate debt with the additional security of a personal guaranty. The substance of the transaction is fully congruent with the form described in the underlying documentation. Without doubt, the advances from Maple Trade to MKI created repayment obligations under a secured loan that is precisely what it appears to be and is not subject to recharacterization.

**4. Illegal Contract**

As another alternative theory to *in pari delicto*, Marco invokes the long-standing common law rule that illegal contracts will not be enforced. "A contract that is illegal in its place of performance is unenforceable in New York if the parties entered into the contract with a view to violate the laws of that other jurisdiction." *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 138 (S.D.N.Y. 2000). Marco argued that because the money from the Loan was used to fund illegal Brazilian mining operations, the contract is unenforceable, and Maple

Trade cannot foreclose on its collateral.  Marco cited various cases involving contracts that were found to be illegal either because they violated the law by their own terms, or because they necessitated illegal conduct.  *See* Marco Kalisch Post Trial Reply Memorandum of Law at 11 (Nov. 24, 2008).  *See also Bankers Trust Co. v. Litton Sys. Inc.*, 599 F.2d 488 (2d Cir. 1979) (finding a contract induced by bribery is voidable); *Stichting*, 145 F. Supp. 2d 356 (S.D.N.Y. 2001) (finding officers of U.S. entity knowingly bribed Panamanian officials to obtain lease concession); *Foley v. Speir*, 3 N.E. 477 (N.Y. 1885) (finding political organization not entitled to enforce contract requiring candidate to make illegal reimbursements); *Sirkin v. The Fourteenth St. Store*, 124 A.D. 384 (N.Y. App. Div. 1908) (finding contract induced by bribe is void and unenforceable and taints all subsequent contracts); *Stone v. Young*, 204 N.Y.S. 690 (N.Y. Sup. Ct. 1924) (finding that an agreement by a corporation to illegally pay dividends from capital is unenforceable).

These cases are distinguishable and are inapplicable to the Loan.  Marco blurs the structural distinction between MKI, Maple Trade's borrower, and M3, the corporate entity involved in illegal activity in Brazil.  The terms of the documentation for the Loan limit the use of the proceeds of the Loan to the purchase of diamonds certified pursuant to the Kimberley Process, demonstrating that the agreement to lend referenced diamonds from authorized sources.  Maple Trade Trial Exhibit 1, Loan Agreement §6(b).  The loan documents contemplated performance in New York, where MKI, (as opposed to M3), agreed that it would be purchasing Kimberley certified diamonds.  Therefore, the maxim cited by Marco's counsel, *Ex turpi contractu non oritur actio*, is inapplicable here.  The contract itself was not immoral or illegal, as it did not violate the law by its terms.

The illegal cross-border activities orchestrated by Marco were taking place exclusively within Brazil.  While related to MKI, these activities were not directly contemplated by or necessary to the performance of the loan agreement.  Only Marco knew in detail how the proceeds would be used, and his own conduct in Brazil is insufficient to taint the Loan agreement, especially in a situation such as this where Marco concealed material facts from the lender concerning the means by which M3 would be acquiring diamonds.  Given the particular facts presented, the transaction between lender and borrower is not infected by the misconduct of its borrower's principal in Brazil, and Maple Trade is entitled to enforce remedies under the Loan documents, including the guaranty.

**5.  Mayra and the Apartment**

### a.  Mayra's Rights in the Apartment are Governed By State Law

Mayra asserts that her interest in the Apartment is superior to Maple Trade's security interest, because the Coop documents did not reflect the intention of husband and wife, the expectations of their neighbors or of certain documents prepared in connection with the earlier Emigrant financing.  She argues that both Marco and Mayra should be named owners of the Apartment as tenants by the entireties, relating back to the time of the Emigrant loan and the purchase of the Solimenes' apartment in 1999.  To accomplish her goal, she invokes the equitable powers of this Court to reform the documents.

This Court is a court of equity, but there are limits upon the exercise of these equitable powers.  "Property interests are created and defined by state law."  *Butner v. United States*, 440 U.S. 48, 55 (1979).  The central question before the Court in Mayra's case does not involve bankruptcy law considerations, but the application of state law

principles at their most fundamental level--ownership of property. As stated by the

United States Supreme Court in *Butner,* "Unless some federal interest requires a different

result, there is no reason why such interests should be analyzed differently simply

because an interested party is involved in a bankruptcy proceeding." *Id.* Therefore, the

Court will look to state law to guide its decision.

**b. Title to the Apartment May Not be Reformed Retroactively**

Under New York law, reformation of title documents is permitted, but only if it

would not prejudice the rights of a *bona fide* purchaser or subsequent lien holder. *See*

*Burlingham v. Hanrahan,* 251 N.Y.S. 55, 61 (N.Y. Sup. Ct. 1931). It is undisputed that

Maple Trade became a subsequent lien holder when it made the Loan secured by Marco's

pledge of the Apartment. However, to be a *bona fide* subsequent lien holder, the lender

must not have been on notice of Mayra's purported interest in the Apartment or, if it had

such notice, must have performed sufficient diligence to determine the true owner.

Mayra's theory is that Maple Trade does not qualify as a *bona fide* subsequent lien holder

because Maple Trade was on inquiry notice that both Marco and Mayra owned the

Apartment and failed to do all that it should have done to ascertain Mayra's interests.

"The recording acts charge the purchaser [or in this case, the lien holder] with

notice only of matters in the record and matters outside the chain of title do not constitute

notice." *See Doyle v. Lazarro*, 306 N.Y.S.2d 268, 270 (N.Y. App. Div. 1970). Hilton

Sonniker, counsel for Maple Trade, acknowledged during his testimony that he

discovered during a lien search the existence of a UCC-1 filing that identified Mayra as a

debtor in connection with the Emigrant loan. This discovery was sufficient to put him on

inquiry notice that Mayra might have an ownership interest in the Apartment. Trial Tr.,

22:23-26:10, July 31, 2008 A.M.  Inquiry notice simply requires reasonable further examination regarding the matter at issue--here, title to the Apartment.  Accordingly, if Maple Trade made due inquiry regarding ownership of the Apartment and found evidence that Marco was the sole owner, it has done all that New York law requires to be considered a *bona fide* subsequent lien holder.

Mayra's claim that she should defeat the Maple Trade security interest and be deemed an owner of the Apartment as of the date of the Emigrant financing calls for a review of the nature and extent of Maple Trade's actions once it recognized that Mayra might have an interest in the Apartment.  Her efforts to trump Maple Trade depend on what Maple Trade did to investigate title to the Apartment after discovering the UCC-1 form with her name on it.  Reformation of the title documents would be an available remedy if that investigation were inadequate under the circumstances.

Based on the record, the Court concludes that Maple Trade, through its counsel, Mr. Sonniker, did what a reasonable lawyer would do under like circumstances to determine title to the Apartment.  Mr. Sonniker concluded that Marco was the sole owner of the Apartment "based on the stock certificate, lease, Mr. Kalisch's five or six representations of being hundred percent owner and getting an independent recognition agreement from the board of directors, from Rosa Ganguzza, vice president, certifying that Marco is on the books and records of the cooperative corporation, the only shareholder and owner."  Trial Tr., 27:8-14, July 31, 2008 A.M.  The Coop Stock Certificates and the Ganguzza Recognition Agreement that were entered into evidence support that assertion.  Maple Trade Trial Exhibit 14, Supreme Court Record on Appeal at 136-39.

One thing that Mr. Sonniker did not do was attempt to obtain a certification from Mayra that she was not an owner. That extra step, which Mayra's counsel urges was required, was not needed in light of other assurances of Marco's ownership. The Court is satisfied that counsel for Maple Trade did all that was reasonably necessary to verify that Marco was the sole owner of the Apartment. Indeed, when the Apartment was pledged as collateral for Maple Trade, Marco indisputably was the sole owner according to the Coop's own corporate records. The fact that the Kalisches reissued the Coop stock certificates in the names of both Marco and Mayra two weeks **after** Maple Trade served its notice of default further demonstrates that the Kalisches recognized that Mayra was not listed as an owner when the Loan was approved and that the documents issued by the Coop needed to be revised after the Loan had already gone into default.

Maple Trade qualifies as a bona fide subsequent lien holder for present consideration whose rights would be greatly prejudiced by reformation of the Coop share certificates. *See Ward v. Ward,* 858 N.Y.S.2d 774 (2008). Given the pattern of inquiry notice followed by an investigation that confirmed Marco was the sole owner of the Apartment, followed in turn by the efforts of husband and wife to correct the documentation problem later, reformation is not an appropriate remedy.

Additionally, Mayra is not entitled to relief against Maple Trade simply because she has established her promissory estoppel claim against Marco. Mayra contends that Marco's liability to Mayra is sufficient cause for the Court, as a matter of equity, to order that the Apartment should be deemed jointly owned and for this transformation of the underlying title records to occur retroactively as of a date before the pledge to Maple Trade. Mayra in her papers does not discuss any specific means to achieve this result

36

and, except for invoking general equitable principles, does not articulate a viable theory that would allow the Court to grant such relief.  Mayra Kalisch Reply Brief at 9-10 (Nov. 24, 2008).  Mayra's submissions to the Court prove a case against Marco and cite case law relevant to promissory estoppel.  Without linking promissory estoppel claims to reformation of title documentation, her papers argue that as a matter of equity Mayra's undocumented ownership interest should defeat the lien granted to Maple Trade.  *Id.* Mayra calls generally for the Court to use its equitable powers to grant her rights in the Apartment, but does not suggest any theory under which equitable relief may be granted based on promissory estoppel against a party like Maple Trade that never promised her anything.  Mayra's injury was caused by Marco, but that does not give her the right to a remedy against Maple Trade.  The Court will not exercise its equitable powers on this record to deem Mayra an owner as of the date of the Emigrant loan in 1999.

### *CONCLUSION*

Marco is an admittedly dishonest person who argues that his lender should not be allowed to collect from him because that lender should have known better than to do business with him.  According to Marco, that lender either knew or should have recognized that it was dealing with an untrustworthy borrower or deliberately turned a blind eye to the fact that it was advancing funds that were helping to finance a corrupt enterprise.  Mayra claims to be an innocent spouse with prior undocumented ownership interests in the lender's collateral, who seeks protection from the consequences of having failed to timely document those interests under applicable law and who asserts that Maple Trade was on inquiry notice regarding her prior undocumented interest in the Apartment.

For reasons discussed in this decision, the plaintiffs have not proven their cases against Maple Trade.  Maple Trade shall settle an Order reflecting entry of judgment in its favor in both adversary proceedings.  Mayra may settle an Order in her adversary proceeding granting her judgment against Marco in an amount equal to her share of the Apartment due to Marco's acknowledged failure to fulfill his commitment to share ownership with her before pledging the Apartment as collateral.  Mayra also is entitled to assert a claim in Marco's chapter 11 case for all damages arising out of the loss of her rights to the Apartment.

The parties in Marco's case are directed to contact chambers to arrange a status conference to be held in January relating to the Conditional Order providing for adequate protection payments to Maple Trade and setting forth expedited procedures for relief from stay on five days notice.  Conditional Order, Case No. 06-10706, (ECF Doc. #35). Marco has failed to comply with the requirements of that Order for well over a year, and further proceedings should be scheduled promptly regarding the Conditional Order. Either that Order should be enforced in accordance with its terms or relief from its provisions should be granted for cause shown.


Dated: New York, New York
      December 31, 2008


   _/s/ James M. Peck_____
   Hon. James M. Peck
   United States Bankruptcy Judge